UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL ROSA,

                          Plaintiff,

          -against-                                         3:12-CV-0170 (LEK/TWD)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

                          Defendant.

_____

**MEMORANDUM-DECISION and ORDER**

**I.      INTRODUCTION**

          This case has proceeded in accordance with General Order 18 of the United States District

Court for the Northern District of New York, which sets forth the procedures to be followed when

appealing a denial of Social Security benefits.  Both parties have filed briefs.  Dkt. Nos. 12

("Plaintiff's Brief"), 14 ("Defendant's Brief").  Oral argument was not heard.  For the reasons

discussed below, the Commissioner's decision is reversed, and this matter is remanded for a new

hearing.

**II.     BACKGROUND**

          **A.  Procedural History**

          Plaintiff Michael Rosa ("Plaintiff") was born on October 1, 1974.  Administrative Transcript

(Dkt. No. 9) ("Tr.") at 166, 985.  He completed tenth grade and was in special educational classes.

Id. at 989-90.  He reads at the second-grade level and spells at the third-grade level.  Id. at 998.  In

_____

          [1] The Clerk is directed to substitute Carolyn W. Colvin, Acting Commissioner of Social
Security, for Defendant Michael J. Astrue and amend the caption accordingly.  See FED. R. CIV. P.
25(d).

the past, he has worked as a dishwasher, a security guard, and a bowling pinsetter.  Id. at 990-92.

Plaintiff alleges disability due to heart disease, arthritis in his back and neck, right shoulder

problems, foot problems, and anxiety.  Id. at 994-98.

Plaintiff applied for disability insurance benefits and Supplemental Security Income ("SSI")

on January 13, 2006.  Id. at 166.  The application was denied on February 28, 2006.  Id. at 74.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Id. at 80.  The hearing

was held on December 6, 2007.  Id. at 1028.  On April 25, 2008, the ALJ issued a decision finding

that Plaintiff was not disabled.  Id. at 44.  On April 28, 2008, Plaintiff filed a request for review with

the Appeals Council.  Id. at 102.  In an order dated March 11, 2010, the Appeals Council vacated

the hearing decision of April 25, 2008, and remanded the case to an ALJ for further proceedings.  Id.

at 109.  On May 24, 2011, another hearing was held.  Id. at 977.  On August 9, 2011, the ALJ issued

a decision finding that Plaintiff was not disabled.  Id. at 22.  The ALJ's decision became the final

decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on

January 9, 2012.  Id. at 11.  Plaintiff timely commenced this action on January 24, 2012.  Dkt. No. 1

("Complaint").

### B.  The ALJ's Decision

The ALJ made the following findings:

1.  Plaintiff met the disability insured status requirements of the Social Security Act through December 31, 2010.  Tr. at 24.

2.  Plaintiff has not engaged in substantial gainful activity since April 12, 2005, the alleged onset date of disability.  Id.

3.  Plaintiff had the following "severe" impairments: heart disease, a reading disorder, and a spelling disorder.  Id.

4.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  Id. at 26.

5.  Plaintiff had the residual functional capacity ("RFC") to perform less than the full range of sedentary work, with occasional crouching, and no lifting above mid-chest level with the right (non-dominant) hand, avoiding respiratory environmental exposures, with the basic mental demands of competitive, remunerative, unskilled work, and requires oral directions and instructions.  Id.

6.  Plaintiff had no past relevant work within the RFC.  Id. at 29.

7.  Considering Plaintiff's age, education, work experience, and RFC, claimant was not disabled as there are jobs that exist in significant numbers in the national economy that he can perform.  Id.

**C.  The Parties' Briefs**

Plaintiff argues that: (1) the Commissioner did not sustain her burden of proving that there are a significant number of jobs in the national economy Plaintiff could perform within his RFC; (2) the ALJ did not properly consider Plaintiff's reading level and spelling level; and (3) the ALJ erred in failing to find that Plaintiff's neck, back, and/or shoulder conditions were severe.  See generally Pl.'s Br.  Defendant contends that the ALJ's decision applied the correct legal standards and is supported by substantial evidence and thus should be affirmed.  See generally Def.'s Br.

**D.  Medical Testimony**

Plaintiff raises no argument relating to the ALJ's finding that Plaintiff was limited to less than a full range of sedentary work due to his cardiac issues.  Dkt. No. 15-1 at 5.  Therefore, although the bulk of the record pertains to the cardiac care, this issue will not be discussed here.  Furthermore, Plaintiff raises no arguments regarding the ALJ's findings on his psychological impairments other than contending that the ALJ did not adequately consider Plaintiff's second-grade

3

reading and third-grade spelling levels.  Pl.'s Br. at 2, 11;[1] see also Tr. at 639, 643.  Therefore, the uncontroverted IQ test results will be briefly reviewed.  The Court also summarizes the relevant care Plaintiff received for his neck, back, and shoulder, because he maintains that the ALJ erred in failing to find those conditions "severe" at step two of the sequential analysis.  Pl.'s Br. at 3, 12.[2]

### E.  The IQ Testing

A consultative intelligence evaluation was completed on February 11, 2008, by Mary Ann Moore, Psy. D.  Tr. at 637.  Plaintiff reported to Dr. Moore that he completed nine years of schooling both in regular and special education classes.  Id.  His expressive and receptive language abilities were "concrete but adequate" and he did "not need repetition in instructions."  Id. at 638.  Testing using the Wide Range Achievement Test, Third Edition, showed his reading/decoding level to be at the second-grade equivalent and his spelling level to be at the third-grade equivalent.  Id. at 639.  His full-scale IQ was 87, and his reading and spelling scores were "suggestive of a reading and spelling disorder."  Id.  Ultimately, Dr. Moore opined that Plaintiff

> [c]an follow and understand simple instructions, perform simple and rote tasks under supervision.  He can perform some simple tasks.  He did show intact attention and concentration.  Memory was just mildly impaired.  He has the ability to learn simple and complex tasks although it may take him slightly longer especially if information is given in a auditory manner.  He generally appears to have the ability to deal with stress, as well as relate to others.  He has problems with reading and spelling, which may cause difficulties with making appropriate work decisions depending upon the manner in which tasks are presented to him.  For example, he would have difficulty in decision making if questions presented in a written manner to him.  He generally can

---

[1] In referring to specific pages in the parties' briefs, the Court uses the numbers at the bottom of each page instead of the numbers electronically inserted by the Clerk of the Court.

[2] Plaintiff's argument that his orthopedic conditions should have been found "severe" is somewhat confusing since he states that "no issue is raised as to the first four steps, the ALJ having found all four including that Plaintiff was unable to perform his past relevant work."  Pl.'s Br. at 6.  Nevertheless, in the interests of completeness, the medical records pertaining to this issue will be addressed.

4

maintain a regular work schedule.

The results of the examination are consistent with learning problems which may significantly interfere with the claimant's ability to function on a daily basis.

Id. at 640.  Dr. Moore noted that Plaintiff's second-grade reading and third-grade spelling abilities could interfere with work abilities.  Id. at 643-44.

### F. Plaintiff's Neck, Back, and Shoulder Treatment

Between February 2008 and December 2008, Plaintiff was treated for lower back pain complaints on seven occasions by his providers at Johnson City Family Care.  Id. at 683, 687, 693, 698, 703, 706, 709.  At two of those visits, he also complained of neck pain.  Id. at 706, 709.  His range of motion was normal, but he was diagnosed with a cervical and lumbar strain.  Id. at 706, 709.  On March 19, 2008, his physical exam showed that he had a normal gait, he could heel-toe walk without difficulty, and he could squat without difficulty.  Id. at 706.  He was treated with osteopathic manipulation therapy and Tylenol.  Id. at 704, 707.  On September 9, 2008, his physical exam again showed that he had a normal gait, he could heel-toe walk without difficulty, and he could squat without difficulty.  Id. at 698.  He received physical therapy for his lower back and declined therapy on his neck on six occasions between August 21, 2008, and September 11, 2008. Id. at 647-59.  He was treated for paravertebral spasms on October 7, 2008, October 14, 2008, and December 8, 2008.  Id. at 683, 687, 693.  During that time, he was able to heel-toe walk without difficulty.  Id. at 687.  He was treated with a pain patch and a stretching plan.  Id. at 683, 687, 693. He next complained of lower back pain on June 3, 2009, after moving furniture and was prescribed the pain medication Vicodin.  Id. at 671.

Lower spine x-rays on May 13, 2010, were essentially normal, showing mild disc narrowing at L4-5.  Id. at 838.  Thoracic x-rays of the same date were also essentially normal, showing only

end-plate spurring at T11-12.  Id. at 837.  A CT scan in August of 2011 showed mild disc bulges in Plaintiff's lumbar spine with no nerve root compression.  Id. at 939.

On August 24, 2011, Plaintiff was seen by a physician assistant in the Southern New York Neurosurgery Group, P.C., who found Plaintiff had a slow, antalgic gait, with some mild lumbar spasms, but on exam was able to move his legs quite well, had full strength, and his reflexes were grossly intact.  Id.  Dr. Khalid Sethi also examined Plaintiff during this visit and deemed him to be stable.  Id.  No treatment was provided.  Id.

Plaintiff was treated for right shoulder pain on three occasions between January 18, 2011, and April 7, 2011.  Id. at 878, 880, 882.  An MRI on January 31, 2011, was negative for injury.  Id. at 884.

### G. Consultative Exams

Plaintiff was seen by Irwin Rosenberg, M.D., an orthopedic surgeon, for a consultative exam on June 1, 2011, at the request of Plaintiff's counsel.  Dr. Rosenberg found Plaintiff to have marked restriction in his range of motion of the lumbar spine and diffuse tenderness in the paravertebral muscles of the cervical dorsal and lumbar spines, but no obvious spasm.  Id. at 874.  Plaintiff's shoulder had marked limited range of motion.  Id.  Dr. Rosenberg opined the Plaintiff could walk less than 100 yards, could not squat or kneel, and could not sit for more than one hour at a time.  Id.

Plaintiff was seen at the request of the Commissioner by George Sirotenko, D.O., on August 6, 2007.  Dr. Sirotenko found Plaintiff had degenerative joint disease of the lumbar spine, with mild limitations on forward flexion, rotation and extension, but the cervical spine was within normal limits.  Id. at 602.

6

**H.  The Vocational Expert's Testimony**

At step five of the sequential analysis, the ALJ found, based upon testimony of David Festa, the vocational expert, that there were two jobs in the national economy that Plaintiff could perform: "final assembler" and "lens inserter."  Tr. at 1017.  In this regard, the ALJ posed several hypothetical questions, each building on the previous question, focusing on restrictions that were "[l]ess than light, meaning less than lifting and carrying 20 pounds occasionally, but only 10 pounds—less than 10 pounds frequently, putting it essentially in a sedentary classification."  <u>Id.</u> at 1017.  The ALJ posed the following other restrictions in the relevant hypothetical:

> Assuming a hypothetical individual of the claimant's age, education, and past work experience; and further assume that that [sic] individual . . . can stand and walk six out of an eight-hour period, sit six out of an eight-hour period; can occasionally crouch, and should avoid concentrated exposure to temperature extremes, wetness, fumes, odors, dust, gases and pulmonary irritants. . . . Mentally, can understand, remember, and carry out simple instructions, and make simple work-related decisions; and is moderately limited . . . in understanding, and remembering, and carrying out complex instructions, and judgments on complex work-related decisions.  There are no limitations in interacting with the public, supervisors, or coworkers; and . . . is mildly limited in responding appropriately to changes in usual work situations, and changes in a routine work situations; but instructions and directions should be given orally.

<u>Id.</u> at 1015.  The ALJ further added "no lifting with the right upper extremity above the mid-chest . . . and the right upper extremity is the non-dominant arm."  <u>Id.</u> at 1016.  Ultimately, the ALJ asked: "would there be any jobs with that hypothetical, both physical, and using the same mental that I previously used in hypotheticals one and one (a)?"  <u>Id.</u> at 1017.  Festa responded:

> I can find positions that do not require, in my experience, reaching above the chest level.  One would be a lens inserter.  The <u>DOT</u> [(<u>Dictionary of Occupational Titles</u>)] number is 713.687-026.  And the SVP: 2, unskilled.  Exertional is sedentary.  National statistics are 239,950; New York state, 4,310; southern tier region, 130.  Another example would be a final assembler.  The <u>DOT</u> code is 713.687-018.  The SVP: 2, unskilled.  Exertional, sedentary.  And statistics, exactly the same as lens inserter.

7

Id.

On cross-examination, however, Festa testified that the reason the number of jobs was the same for both the lens inserter and the final assembler positions was because both occupations are in the same standardized occupational code in the statistics provided by the Bureau of Labor Statistics and New York State Department of Labor.  Id. at 1023.  Festa further testified that the occupational code that includes both jobs also includes approximately 1587 different DOT titles.  Id.  The following exchange took place between Plaintiff's attorney and Festa:

> Q. Okay.  Without those two [jobs], it's 1,585 more.  And, without being totally ridiculous, there are not 1,587 times 239,950 jobs nationally for that one . . . code, correct?  There, there is just 239,950 jobs nationally for all the jobs in all 1,587 different DOT titles? . . .
>
> A. I'm just trying to interpret what you're saying.  The 239,950 jobs are part of the same standard occupational code.  Within that, there are 1,580 so much jobs [sic], the number, the total number is for the code, not the DOT number.
>
> Q. The total number is for the 1,587 jobs?
>
> A.  That's correct.
>
> Q. So, so if we, if we took the time, and we're not going to, trust me, to look up each of those other codes, we find again the same numbers for, you know, 1,587 different times.
>
> A.  That's correct.
>
> Q.  And again, without going into it specifically, many of those jobs would be medium, many of those jobs would have an SVP over 2, many of those jobs would require reaching, and, and many or most of those jobs would be unavailable to this claimant under any of the hypotheticals given by the Administrative Law Judge?
>
> A.  That's a fair statement.

Id. at 1024.  Festa further testified that he did not have the specific numbers such as a breakdown job analysis for the lens inserter and final assembler jobs.  Id. at 1024-1025.

The ALJ concluded that: (1) Plaintiff was able to perform both the lens inserter and final

8

assembler positions; (2) those positions existed in significant numbers in the economy; and (3) Plaintiff was therefore not entitled to disability benefits.  Id. at 29.

### III.   LEGAL STANDARD

#### A.  Standard for Benefits

To be considered disabled, a claimant seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In addition, a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority,[3] the Social Security Administration ("SSA") has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  20 C.F.R. § 416.920.  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further."  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).

> At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities."  [Id.] §§ 404.1520(c), 416.920(c).  At step three, the agency

---

[3] 42 U.S.C. §§ 405(a), 1383(d)(1).

determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [Id.] §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  [Id.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

Id. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).  If the plaintiff-claimant meets her burden of proof, the burden shifts to the defendant-Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working.  Id. at 265.

**B.  Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Featherly v. Astrue, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts that the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  Johnson, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).  An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial

evidence supports the decision.  Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010);

Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  "Substantial evidence has been defined as

'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Williams ex rel. v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  It must be "more than a mere

scintilla" of evidence scattered throughout the administrative record.  Featherly, 793 F. Supp. 2d at

630; Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  "To determine on appeal whether an ALJ's findings are supported by

substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which

detracts from its weight."  Williams, 859 F.2d at 258.  However, a reviewing court cannot substitute

its interpretation of the administrative record for that of the Commissioner if the record contains

substantial support for the ALJ's decision.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.

1972); see also Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

IV.    **DISCUSSION**

    **A. Plaintiff's Orthopedic Impairments**

    Plaintiff argues that the ALJ erred in finding that his back, neck, and shoulder impairments

were not "severe."  Pl.'s Br. at 12.  Yet he also states that "no issue is raised as to the first four steps

[of the sequential analysis], the ALJ having found all four including that Plaintiff was unable to

perform his past relevant work."  Id. at 6.  The Commissioner argues that because the claim

proceeded beyond step two of the analysis and the ALJ properly considered the non-severe

impairments of the neck, back, and shoulder "[a]t subsequent steps, any purported step two errors

are completely harmless."  Def.'s Br. at 5.  The ALJ's determination that Plaintiff's orthopedic

conditions were not severe was based upon substantial evidence and therefore not error in this regard; even if it were error, however, the Commissioner is correct that it was a harmless error.

The ALJ found that the Plaintiff's back and neck pain and the healed clavicle fracture were "[n]ot 'severe' impairments that meet the 12-month duration requirement. With regard to the claimant's back and neck complaints, the record contains no abnormal findings from an MRI scan or any other detailed diagnostic image of the claimant's lumbar or cervical spine." Tr. at 26.

As stated *supra*, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities. The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). Basic work activities that are relevant for evaluating the severity of a physical impairment include the physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. Id.; see also Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y. 1996).

 An impairment is severe if it causes more than minimal functional limitations. 20 C.F.R. § 416.924(c). Age, education, and work experience are not evaluated in determining if the impairment or combination of impairments are severe. Id. § 416.920(c). The severity analysis does no more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above the *de minimis* level, then further analysis is warranted. Id. Where a claimant alleges multiple impairments, the combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. Id. at 1031. The next inquiry is whether a claimant retained the RFC to perform her past work; this inquiry must consider the combined effect of any impairments, whether or not they are severe, through the remaining steps. 20 C.F.R. § 404.1523; Dixon, 54 F.3d at 1031.

12

As noted *supra*, Plaintiff was treated for lower back pain complaints by his providers at Johnson City Family Care on seven occasions between February 2008 and December 2008.  Tr. at 683, 687, 693, 698, 703, 706, 709.  He complained of neck pain at only two of those visits.  Id. at 706, 709.  He was diagnosed with a cervical and lumbar strain.  Id. at 706.  Although he complained of pain, physical exams were relatively normal.  Id. at 698, 706.  His range of motion was normal. Id. at 709.  He received physical therapy for his lower back on six occasions between August 21, 2008, and September 11, 2008.  Id. at 647-59.  He declined therapy on his neck.  Id. at 646.  He was treated with a pain patch and a stretching plan.  Id. at 683, 687, 693.  Plaintiff next complained of lower back pain on June 3, 2009, after moving furniture.  Id. at 671  He was prescribed pain medication.  Id.  Spine x-rays, thoracic x-rays, and a CT scan were unremarkable.  Id. at 837, 838, 939.

Plaintiff's next spine medical visit was on August 24, 2011, when he was seen by a physician assistant in Southern New York Neurosurgical Group, P.C., who found Plaintiff had a slow, antalgic gait, with some mild lumbar spasms, but—on exam—was able to move his legs quite well, had full strength, and his reflexes were grossly intact.  Id. at 939.  Dr. Khalid Sethi also examined Plaintiff that day and deemed him to be stable.  Id.  No treatment was provided, and the examiner deferred any disability determination to Plaintiff's primary care provider.  Id.

As for his right shoulder, Plaintiff was treated for pain in this region on three occasions between January 18, 2011, and April 7, 2011, by a physician and a physician assistant at Orthopedic Associates.  Id. at 878, 880, 882.  An MRI of the shoulder performed on January 31, 2011, showed no injury.  Id. at 884.

There is no medical evidence or opinion in the records from Johnson City Family Care, Southern New York Neurosurgical Group, or Orthopedic Associates by any of Plaintiff's treatment

13

providers that his neck, lower back, and shoulder caused more than minimal functional limitations. Further, diagnostic tests did not reveal abnormal findings. Therefore, the ALJ applied the appropriate legal standards in making his determination at step two of the analysis that Plaintiff's neck, lower back, and shoulder complaints were not "severe," and that determination is supported by substantial evidence.

Additionally, any claimed error at step two is harmless since the ALJ proceeded beyond it in the sequential analysis. Stanton v. Astrue, 370 F. App'x 231, 233 n.1 (2d Cir. 2010); Kemp v. Comm'r of Soc. Sec., No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011); Cook v. Astrue, No. 08-CV-1351, 2011 WL 2490996, at * 4 (N.D.N.Y. May 24, 2011). Furthermore, the ALJ clearly considered the Plaintiff's orthopedic complaints in determining his RFC since Plaintiff was limited from "[l]ifting with the right (non-dominant) upper extremity above mid-chest level." Tr. at 26.

### B. Consideration of Plaintiff's Reading and Spelling Disorders

Plaintiff argues that the ALJ did not properly consider the extent of Plaintiff's second-grade reading and third-grade spelling disorders because there is no analysis of how the disorders might affect Plaintiff's sedentary job base. Pl.'s Br. at 11. The Commissioner asserts that the ALJ properly considered Plaintiff's severe reading and spelling disorders in determining Plaintiff's RFC and in examining his vocational capabilities. Def.'s Br. at 6. The Court concludes that the ALJ did not err in his analysis of these disorders.

The ALJ specifically found Plaintiff's reading and spelling disorders to be severe and—even though one of Plaintiff's past jobs as a pinsetter was semi-skilled—limited Plaintiff to unskilled work with only oral instructions and directions. Tr. at 26, 1013. The ALJ also found that Plaintiff could understand, remember, and carry out simple instructions and could make simple

work-related decisions.  Id.  Plaintiff raises no argument regarding the RFC determination.  See Pl.'s Br. at 6 ("In this case, no issue is raised as to the first four steps.").  Furthermore, hypothetical questions posed to the Vocational Expert at Plaintiff's hearing considered Plaintiff's educational background and that "[i]nstructions and directions should be given orally."  Tr. at 1014-1015.  Thus, the ALJ's decision properly reflects consideration of the extent of Plaintiff's reading and spelling disorder and therefore is supported by substantial evidence.

### C. ALJ's Step Five Analysis

The crux of Plaintiff's argument is that Festa's testimony did not establish there were a significant number of jobs available to Plaintiff in the national and regional economy and therefore the Commissioner did not sustain her burden at step five of the sequential analysis.  Pl.'s Br. at 5. Defendant argues that the ALJ's step-five determination was sufficiently supported by Festa's testimony.  Def.'s Br. at 7.  For the following reasons, the Court concludes that the Commissioner did not sustain her burden at step five.

Where a claimant is able to demonstrate that her impairments prevent a return to past relevant work, the burden then shifts to the Commissioner to prove that a job exists in the national economy which the claimant is capable of performing.  Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)); see also 20 C.F.R. §§ 404.1560(c), 416.960(c).  The ALJ may apply the grids or consult a vocational expert ("VE").  See Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999).

The VE may testify as to the existence of jobs in the national economy and as to the claimant's ability to perform any of those jobs, given her functional limitations.  See Colon v. Comm'r of Soc. Sec., No. 6:00-CV-0556, 2004 WL 1144059, at *6 (N.D.N.Y. Mar. 22, 2004).  A

15

vocational expert's testimony is useful only if it addresses whether the particular claimant, with her limitations and capabilities, can realistically perform a particular job.  See Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1984).  The ALJ is responsible for determining the claimant's capabilities based on all the evidence, and the hypothetical questions must present the full extent of the claimant's impairments to provide a sound basis for the VE's testimony.  Colon, 2004 WL 1144059, at *6.  However, there must be "'substantial record evidence to support the assumption upon which the [VE] based his opinion.'"  Id. at *6 (quoting Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983)).

According to the Regulations, "[w]ork exists in the national economy where there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."  20 C.F.R. §§ 404.1566(b), 416.966(b).  "Courts have generally held that what constitutes a 'significant' number is fairly minimal."  Fox v. Comm'r of Soc. Sec., No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009).

Plaintiff contends that the VE's testimony was insufficient to support a finding that a significant number of jobs exist in the national economy that Plaintiff could do because Festa failed to specify the number of positions for a lens inserter and final assembler that exist in the national, state, and regional economy.  Pl.'s Br.  As discussed *supra*, the numbers to which Festa testified pertained to a broad category of jobs that included positions other than lens inserter and final assembler positions.  Tr. at 1024-1025.  Festa could not say how many lens inserter and final assembler positions existed.  Id.  He also testified that the numbers to which he referred for that broad category of jobs included positions that Plaintiff would not be able to perform because of his functional limitations.  Id. at 1024.  Under these circumstances, Festa's testimony was hardly clear

16

as to the number of jobs available to Plaintiff in the local or national economy.  This testimony

therefore does not constitute substantial evidence.  See Johnston v. Barnhart, 378 F. Supp. 2d 274,

283 (W.D.N.Y. 2005) (finding that the ALJ erred where the VE's testimony concerning numbers of

jobs available pertained to broad category of jobs that included positions other than the two jobs

claimant could perform within her limitations and the VE could not say how many positions existed

for those two jobs); cf. Kennedy v. Astrue, 343 F. App'x 719, 722 (2d Cir. 2009) ("[A]though the

vocational expert acknowledged that the data on which she relied in determining the existence of

'charge-account clerk' positions . . . also encompassed approximately 59 other DOT titles, viewed

in context, it is apparent that the expert arrived at her estimated figures for charge-account clerk

positions by discounting from the total numbers for all 60 DOT titles.  Thus, the expert's testimony

on this point did not introduce any meaningful uncertainty as to the number of charge account clerk

positions available in the local or national economy.").

　　　　After carefully reviewing the entire record and for the reasons stated, the Commissioner's

denial of benefits was not based upon substantial evidence.  Therefore, the matter must be

remanded.

**V.　　CONCLUSION**

　　　　Accordingly, it is hereby:

　　　　**ORDERED**, that the decision of the Commissioner is **REVERSED** and **REMANDED**,

pursuant to sentence four of 42 U.S.C. § 405(g),[4] for a new hearing consistent with this

Memorandum-Decision and Order; and it is further

---

[4] Sentence four reads, "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

**ORDERED**, that the Clerk of the Court substitute Carolyn W. Colvin, Acting

Commissioner of Social Security, for Defendant Michael J. Astrue and amend the caption

accordingly; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all the parties.

**IT IS SO ORDERED**.


DATED:        March 27, 2013
              Albany, New York


Lawrence E. Kahn
U.S. District Judge